**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBRA FLYNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13CV2449 HEA |
| | ) | |
| ASCENSION HEALTH LONG TERM | ) | |
| DISABILITY PLAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on the parties' respective Motions for Summary

Judgment. [Doc. Nos. 58, 61]. The matter is fully briefed. For the reasons set forth below, the

Court will deny both Motions and remand this case to Defendant Sedgwick with directions to

reopen the administrative record.

### Introduction

Plaintiff Debra Flynn ("Plaintiff") was an employee of Providence Hospital and

participated in Defendant Ascension Health's self-funded Long Term Disability Plan (the "LTD

Plan"), which is administered by Defendant Sedgwick Claims Management Services, Inc.

("Sedgwick"). Plaintiff  brings this action under the Employment Retirement Income Security

Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, alleging that Defendants improperly denied her

claim for long term disability benefits in breach of the terms of the LTD Plan, and Defendants'

fiduciary duties. Plaintiff seeks declaratory relief, an accounting, injunctive relief, and attorneys'

fees.

**Facts and Background**

**A.     The LTD Plan**

Plaintiff is a 54 year-old former manager of a radiation oncology clinic for Providence Hospital. She began working for Providence Hospital in Southfield, Michigan in 1998. She became the chief radiation therapist at Providence Hospital in July of 2004. Approximately eight years later, in July of 2012, Plaintiff stopped working due to the disabling effects of a plethora of diagnosed medical conditions.

According to Defendant Ascension's job description for Plaintiff, the physical demands of Plaintiff's "Regular Occupation" as manager of the radiation oncology clinic required that Plaintiff be able to walk and stand approximately 80% of the time. The job description also states that the job required Plaintiff to frequently lift and position patients and/or equipment up to 40 pounds. The material duties of the job include: "Under general supervision, oversees technical staff and execution of treatment plans. Provides functional supervision over staff therapists. Oversees daily operations of treatment services." In addition to the duties described above, Plaintiff managed a department of 15 employees and assisted therapists where and when needed. She was also required to audit treatment charts and input billing into the computer, make monthly schedules, chart rounds with physicians, conduct meetings, and keep track of the number of patients treated on a daily basis.

Defendant Ascension sponsors the LTD Plan for the benefit of eligible associates of its affiliated hospitals and health systems, including St. John Providence Health System. The LTD Plan is an employee welfare benefit plan governed by ERISA. Defendant Ascension is the LTD Plan Administrator and LTD Plan Sponsor. The LTD Plan provides that the administrator "shall have the discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan." The LTD Plan gives Defendant

Ascension the power to delegate its authority to other administrators. In accordance with the terms of the LTD Plan, Defendant Ascension has delegated the discretionary authority with regard to claims administration to Defendant Sedgwick, the Claims Administrator.[1] In this regard, the LTD Plan provides:

*2.8 Authority, Duties and Responsibilities of the Claims Administrator*

The Claims Administrator shall have the authority, duties, and responsibilities set forth in this Section 2.8. The Claims Administrator shall have the discretionary authority to decide all questions arising in connection with matters set forth in this Section 2.8. Any such decision by the Claims Administrator shall be conclusive and binding on all persons. . . . Any interpretations or determinations made pursuant to such discretionary authority of the Claims Administrator shall be upheld in judicial review unless it is shown that the interpretation or determination was an abuse of discretion.

The duties of the Claims Administrator shall include but not be limited to the following:

(a) The Claims Administrator shall have discretionary authority to determine whether a Participant is eligible to receive or to continue to receive a Benefit under the Plan and to compute the amount of such Benefit.

(b) The Claims Administrator shall have the discretionary authority to make all claims determinations in accordance with Section 2.12 and 2.13 of this Plan.

. . .

(f) In carrying out its duties under Section 2.8, the Claims Administrator shall have the discretionary authority to interpret and construe all provisions of the Plan.

The LTD Plan defines "Disability/Disabled" in relevant part as follows:

*1.11 Disability/Disabled* means that due to an Injury or Sickness which is supported by objective medical evidence,

---

[1] Plaintiff disputes this delegation, arguing that "Defendant [Ascension] retained discretionary authority by remaining co-plan administrator of the subject plan, as explicitly stated in the plan document." [Doc. No. 67 at ¶ 6] [citing AH 0091]. However, Defendants rebut:

Although the Summary Plan Description states that the LTD Plan is jointly administered by Ascension Health and Sedgwick; the LTD Plan itself details the delegation of authority as between Ascension and Sedgwick. Sedgwick possesses the sole discretionary authority "to determine whether a Participant is eligible to receive or continue to receive a Benefit under the Plan" and "to make all claim determinations in accordance with Sections 2.12 and 2.13 of this Plan."

[Doc. No. 66 at ¶ 33] [citing AH 0019–20]. Defendants are correct.

(a) the Participant requires and is receiving from a Licensed Physician regular, ongoing medical care and is following the course of treatment recommended by the Licensed Physician; and

(1) The Participant is unable to perform:

(A) during the first 24 months of Benefit payments, or eligibility for benefit payments, each of the Material Duties of the Participant's Regular Occupation.

"Material Duties" is defined in the LTD Plan as:

*1.26 Material Duties* means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.

"Regular Occupation" is defined as:

*1.40 Regular Occupation* means the activities that the Participant regularly performed when the Participant's Disability began. In addition to the specific position or job the Participant holds with the Participant's employer, Regular Occupation also includes other positions and jobs for which the Participant has training and/or education to perform in the Participant's profession at the Participant's Employer or any other employer. If the Participant's Regular Occupation involves the rendering of professional services and the Participant is required to have a professional or occupational license in order to work, the Participant's Regular Occupation is as broad as the scope of his or her license.

Article 4 of the LTD Plan addresses the timing of the determination of eligibility for LTD

benefits stating:

(a) A determination as to whether a Participant is eligible for LTD benefits shall be made as of the last day the Participant was actively at work.

(b) When a Participant provides Proof satisfactory to the Claims Administrator that he is Disabled, the Plan will pay a monthly Benefit to the Participant after completion of the Elimination Period. This monthly Benefit will be paid as long as the Disability continues, provided that Proof of continued Disability satisfactory to the Claims Administrator is submitted to the Claims Administrator upon request.

Elimination Period is defined as:

*1.16 Elimination Period* means the number of consecutive calendar days of Disability before Benefits become payable under the Plan. The Elimination Period is specified in the Adoption Agreement and begins on the first day of Disability.

The Adoption Agreement for St. John Health specifies that "[LTD] Benefits begin on the

181st consecutive calendar day of Disability." Thus, in order to receive LTD benefit payments,

an LTD Plan participant must be unable to perform the activities that she regularly performed when her Disability began, with either her own employer or any other employer, whether in the same job capacity or another for which the Participant has training and/or education, until the 181st consecutive calendar day after the first day of Disability.

The long-term disability benefit is 70% of the Plaintiff's former monthly pay minus any other sources of disability income, including Social Security Disability Income, as long as the participant remains totally and permanently disabled, through age 65. Plaintiff's monthly pay was $6959.33. As such, her gross benefit amount is $4,871.53. The Plan provides that "after the claim has been submitted, the Claims Administrator may require the Claimant to undergo an examination by a Licensed Physician and/or vocational assessment by a vocational counselor of its choice when and as often as it deems necessary in its discretion."

**B.      Plaintiff's Claim for LTD Benefits**

Plaintiff stopped working in July of 2012 due to a Crohn's disease flare up, for which she was hospitalized for a week. In October of 2012, Plaintiff applied for long-term disability benefits under the Plan after exhausting her short-term disability benefits. Plaintiff's claim was denied on January 15, 2013, based on a finding that she was not disabled beyond December 4, 2012, and thus did not satisfy the policy's 180-day elimination period, which would have ended January 8, 2013. [AH 0913–15]. Plaintiff appealed the benefit denial in a letter dated July 1, 2013, and Defendant Sedgwick upheld the benefit denial in a letter dated September 3, 2013. [AH 1818–21].

**C.      Plaintiff's Medical History**

On February 26, 2008, Plaintiff was diagnosed with Crohn's disease. Over the next several years, Plaintiff was seen and treated by several physicians: Dr. David Steinberger (primary care/internal medicine); Dr. Ellen Zimmerman (gastroenterologist); Dr. Mark

Silverman (neurologist); Dr. Mark Lebeis (cardiologist); and Dr. Aleem Khan (psychiatry). Additionally, Plaintiff regularly met with Susan Greenshields, Ph.D (psychology).

In late 2011, Plaintiff was diagnosed with osteoporosis and underwent an MRI which revealed that Plaintiff was suffering from (1) a rotator cuff tendinosis without tendon tear, and (2) a joint arthropathy causing encroachment-impingement on the subacromial space and the musculotendinous junction of the supraspinatus.

In June of 2012, Plaintiff was evaluated for hearing loss, upper airway congestion, dizziness and cough. The treating physician noted that Plaintiff was aware of ongoing hearing loss, and a general sense of fatigue and dizziness. Plaintiff underwent an audiogram which concluded that she suffered from "mild right primarily sensorineural hearing loss; borderline left hearing level." [AH 0736]. In July of 2012, Plaintiff reported to Dr. Silverman that she had suffered from chronic headaches her whole life, but that in April she began to have a different kind of headache. Further, Plaintiff reported that she had experienced a drooping of her left eyelid, which did not seem to be going away.

After suffering from a flare up of her Crohn's disease on July 11, 2012, Plaintiff was hospitalized for a week. She was noted to have abdominal pain and increased stools upon arrival to the hospital. While in the hospital, she suffered from several episodes of chest pain. She was also diagnosed with hyperthyroidism. Plaintiff underwent an MRI of the brain on July 11, and CT scans of the abdomen and Pelvis on July 14 and 16, 2012. [AH 0726, 0741–42].

Plaintiff was discharged from the hospital on July 18, 2012. In her discharge note, her treating physicians noted the following:

> While in the hospital and on IV steroids, Plaintiff noticed only a modest improvement in her abdominal pain;
> She had several episodes of chest pain during her hospital stay, during which she was diaphoretic and felt short of breath;

The hospital's physical therapy unit did not believe Plaintiff was fit to be discharged home, which is why they recommended she transition via a subacute rehab facility:

Physical therapy was recommended.

[AH 0743–45]. She was discharged with the following instructions regarding prednisone:

Take 60 mg daily for 7 days, then 50 mg daily for 7 days, then 40 mg daily for 7 days . . . [then] 35 mg for 7 days, then 30 mg for 7 days, then 25 mg for 7 days, then stay on 20 mg until told to discontinue.

[AH 0742].

Plaintiff was evaluated by gastroenterologist Dr. Ellen Zimmerman, gastroenterologist, on July 26, 2012. In her treatment note, Dr. Zimmerman observed:

[Plaintiff] developed worsening diarrhea and chest pain that she feels ultimately was dyspepsia. She was admitted on July 11th to July 18th. . . . She was weak and her balance was not normal and she was admitted. She was sent to a nursing home in Allen Park after discharge. Plan is for her to be there until August 7th. Currently, she has five bowel movements a day, half of which are formed. She has rare blood. She has epigastric pain and pain is in her RUQ and RLQ.

[AH 0243–44]. Dr. Zimmerman noted that Plaintiff was taking 50 milligrams per day of prednisone, and recommended tapering by10 milligrams per day every week until she was down to 40 milligrams per day, and then tapering by 5 milligrams per day every week until she was down to 20 milligrams per day, and then tapering by 5 milligrams per day every week until she was off. [AH 0243–44]. Dr. Zimmerman instructed Plaintiff not to return to work until she was below 20 milligrams per day. [AH 0244].

Plaintiff was evaluated by psychologist Dr. Greenshields for the first time on August 13, and again on August 21, 23, and 30, 2012. Plaintiff reported feelings of sadness, anxiety, depression, lack of concentration, low self-esteem, and not being well enough to work.[2]

---

[2] In September, Plaintiff met with Dr. Greenshields on the 13th and 20th, 2012. Plaintiff met with Dr. Greenshields on October 4, 18, and 25, as well as November 1, 8, 13, and 29. Plaintiff additionally met with Dr. Greenshields on December 6, 13, 17, 20, 27, and 31. In January of 2013, Plaintiff met with Dr. Greenshields on the 3rd, 7th, 10th, 14th, 17th, 21st, and 24th. Plaintiff met with Dr. Greenshields February 7, 11, 14, 18, 21, 26, and 28 of 2013. In March of 2013, Plaintiff met with Dr. Greenshields on the 6th, 7th, 18th, 21st, 25th, 28th, and 30th. In April, Plaintiff met with Dr. Greenshields on the 4th and 25th.

Plaintiff was evaluated by psychiatrist Dr. Khan on August 14, 2012. Dr. Kahn determined Plaintiff is clinically depressed with Generalized Anxiety Disorder, noting:

> 51 year old lady with history of depression and suicidal attempt in the past. Came for psych due to increased depression and constant anxiety. Patient reported recent flare up of her Crohn's disease, was hospitalized and reported worsening of her mood. Feels sad, has crying spells, feels helpless, lots of worries, has anxiety-like butterflies in stomach all the time, worried about different things, always a worrier.

[AH 0162]. On August 20, 2012, Plaintiff saw Dr. Steinberger for her GERD. Plaintiff met again with Dr. Khan on September 4, 2012.

On September 5, 2012, Plaintiff went to the St. Mary Mercy Hospital Emergency Department upon experiencing left facial numbness and left lip droop. The ER physicians determined she had sustained a "cerebrovascular accident," noting that she presented with "left facial numbness and left lip droop." [AH 0685–89]. In a treatment note from the same day, the examining physician who performed a history and physical on Plaintiff noted that Plaintiff's chief complaint was left facial numbness, that she was currently on a prednisone taper at 20 milligrams daily for a flair up of her Crohn's disease in July, that she had photophobia and some blurring in her left eye, and that she denied any other neurologic deficits. [AH 0668–74]. In the physical examination, it was noted: "Moon face secondary to prednisone use; left cheek appears swollen with a slight droop to left side of mouth, drooping of both eyelids, appears worse on left." On September 6, 2012, Dr. Sonia Fernando, neurologist, noted Plaintiff had most likely suffered a TIA in the right middle cerebral artery distribution. Dr. Fernando opined that her daily headaches are muscle contractions. [AH 0676].

Plaintiff underwent an Echo exam on September 7, 2012. The results of the exam showed that she has a PFO (patent foramen ovale), which is a hole in the heart. [AH 0681]. This was confirmed by a transesophageal echocardiogram on September 11, 2012. [AH 0227].

On September 14, 2012, Dr. Steinberger evaluated Plaintiff. He encouraged her to continue physical therapy to improve her strength and balance. He expressed hope that she would improve enough to return to work on October 17, 2012. [AH 0203].

On September 17, 2012, Dr. Zimmerman noted that Plaintiff was experiencing four to five bowel movements a day, and worse associated pain than she previously experienced. Dr. Zimmerman noted that Plaintiff was taking 20 milligrams of prednisone per day, and instructed Plaintiff to taper her prednisone by 5 milligrams a week until she was off of it, and to not return to work until she was below 20 milligrams per day. [AH 0239–41].

Dr. Lebeis, a cardiologist, evaluated Plaintiff for the first time on September 24, 2012. On October 2, 2012, Dr. Khan evaluated Plaintiff. Dr. Steinberger noted on October 10, 2012, that Plaintiff began showing symptoms of a recurrent bladder infection six weeks prior and that such an infection generally lasts six weeks. The symptoms were reported as being severe. Dr. Steinberger noted on October 19, 2012 that, despite trying to return to work, the physical demands and psychological strain had "caused incapacitating anxiety and flare of colitis." [AH 0830]. Accordingly, Dr. Steinberger stated that Plaintiff would "need to go of work again[.]" He also noted that she had a migraine and her depression continued.

Plaintiff met with Drs. Steinberger and Khan on November 6, 2012. Dr. Steinberger noted:

> ASSESSMENT AND PLAN:
> Anxiety and depression – continue prozac and trazadone. We also ordered a TSH to rule out thyroid problems which could be causing your condition. –.
> Colitis – continue your current medications, if symptoms worsen, please give us a call. –.
> Hypertension –.
> Arthropathy –. You can take Tylenol for your pain. Refrain from other NSAIDs like
> ibuprofen. If your pain persists or worsens, please call us. Also continue your daily
> exercises. –. * * *
> HISTORY OF PRESENT ILLNESS:

1. Colitis

Admitted in July 2012 for an exacerbation of colitis at U of M, spent 8 days in hospital for Crohn's disease. She spent 3 weeks in the nursing home.

Due to patient's stress and anxiety, she noted that her symptoms were getting worse. She noted severe nonradiating abdominal pain (severity 5/10) and on and off diarrhea. She takes Norco sometimes motrin which provides modest relief. Symptoms began on October 15th when she lost her job. Symptoms associated with nausea, no vomiting, no blood in stools.

2. Anxiety (followup).

The patient presents with anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, easily startled, excessive worry, fatigue, feelings of guilt, feelings of invulnerability and loss of appetite but denies compulsive thoughts, decreased need for sleep, increased energy, increased libido, paranoia, poor judgment, racing thoughts of death or suicide.

3. Depression.

4. Migraine.

5. Hypothyroidism.

6. Joint pain.

Associated symptoms include difficulty initiating sleep. Additional information: one month ago patient developed difficulty ambulating. She mentions that all of her joints are stiff. She notes pain and tenderness in hand joints as well as her knees and elbows. –

She performs exercises which makes her pain worse. No relief from meds.

[AH 0834–36]. Dr. Khan noted:

"Depression.

Patient was tearful, frustrated, depressed, complaining of poor sleep, feels helpless, sad and depressed. She reported that she lost her job, she was the main breadwinner for her household and these stressors are making her depression worse.

ASSESSMENT:

Exacerbation of mood problems, probably due to recent loss of job and financial concerns."

[AH 1483].

On November 9, 2012, Dr. Silverman wrote a letter to Dr. Steinberger, noting:

Unfortunately, it sounds as if she is losing her job at Providence Hospital. We did get the results of the transcranial Doppler and this was negative. – She has had no recurrence of any TIA or stroke-like symptoms. There is no plan to close her PFO at this time. She is somewhat depressed now and is seeing a psychiatrist. * * * Neurologically, Debra seems to be doing well. She has had no recurrence of any TIA or stroke-like symptoms. She has not had any significant migrainous symptoms. I will see her back in three to four months.

[AH 1503].

On November 21, 2012, Dr. Greenshields completed a "Disability Mental Health Certificate" for Defendant Sedgwick on Plaintiff's behalf, noting: "This [patient] is unable to work and there is no evidence as to when/if she can work." [AH 1612]. On December 2, 2012, Dr. Zimmerman completed a form provided by Defendant Sedgwick, explaining that Plaintiff's Crohn's disease was "objective medical evidence" supporting her disability, and that she would be able to return to work when her prednisone dose decreased to less than 20 milligrams. [AH 1618].

On December 4, 2012, Dr. Khan noted:

> Depression, anxiety.
> Patient reported feeling little better, sleep better, less crying spells, but reported feeling
> tired and drained and wants to stay in bed all the time.
> ASSESSMENT:
> Mood is improved but still has depressive symptoms.
> DIAGNOSES:
> Major depressive disorder, recurrent episode, moderate degree
> Generalized anxiety disorder.

[AH 0336]. The same day Dr. Steinberger noted:

> Myalgia and arthralgia.
> Continues to have joint and muscle pain. 'Every joint' hips, knees, shoulders, fingers, elbows. Improves with rubbing sometimes. Heat helps when applied. Sleeps well with trazadone and Xanax. Sometimes sleeps all day. Psychiatrist changed medication today
> feeling that this could be related to depression."

[AH 0377]. Dr. Steinberger also noted: "Still agree with disability plan for long term." [AH 0375].

On December 17, 2012, Defendant Sedgwick received from Dr. Steinberger a completed form Sedgwick has sent him, in which Dr. Steinberger opined that Plaintiff should "never" return to work on account of her disability. [AH 0897].

Dr. Khan met with Plaintiff on January 15, 2013 and noted that she was clinically depressed, had experienced a flare up of her Crohn's disease, and was sleeping poorly. On January 28, 2013, Dr. Steinberger noted:

> ASSESSMENT PLAN:
> Crohn's disease:
> Continue current medications. Follow up at U of M. If it keeps getting worse than we may have to start steroid.
> Migraine:
> Continue depakote and follow up with neurologist to see if we can change it to something else as you did not have migraine attack in a while.
> Arthritis due to inflammatory bowel.
> Limitation due to disability
> HISTORY OF PRESENT ILLNESS:
> 1. Disability:
> Location of pain was upper back. Additional information: she was denied her disability. Still having severe fatigue, diarrhea, abdominal pain due to Crohn's disease. Having "a lot of nausea." Still having joint pain diffusely but hands and knees are worst. Has a difficult time lifting grandson who weighs 22 lbs. Functional limitations were reviewed.
> 2. Crohn's disease:
> She states the symptoms are acute, her crohn's disease is acting up and she follows up at U of M for that. She does not want to go on steroids. She is stressed out because of disability and that is why her crohn's is acting up.
> FUNCTIONAL LIMITATIONS:
> Patient reports: is able to go up stairs, perform activities of daily living, walk, walk 10 blocks, walk an unlimited distance and walk 5 to 10 blocks. Patient reports: finds it difficult to climb stairs, exercise, get in and out of car, go down stairs, kneel and put on socks and shoes.

[AH 0846–47].

On February 12, 2013, Dr. Khan noted:

> Follow up visit for mood and anxiety. Reported feeling better than before. Started taking Cymbalta 60 mg for the last two weeks and reported less pain in joints and better mood, still complaining of increased sleep, takes Xanax 0.5 mg three times a day.

[AH 0770]. On February 13, 2013, Plaintiff saw Dr. Silverman. [AH 0722].

Plaintiff saw Dr. Zimmerman on March 4, 2013 for a follow up appointment. Dr. Zimmerman noted: "In regards to her medical disability, we did let her know that she would not qualify for medical disability based on the severity of her Crohn's disease." [AH 1779].

On March 13, 2013, Dr. Steinberger saw Plaintiff and noted:

HISTORY OF PRESENT ILLNESS:
Chronic conditions –.
Hypertension  –;  Hypothyroidism  –;  inflammatory  bowel  disease  crohn's
diagnosis –chronic stable headaches. Having a headache daily. Wakes up every
morning feeling poorly. Head pounding, upset stomach, feet and shoulders hurt.
Hard to walk. Low back pain.

[AH 0854]. On March 28, 2013, Plaintiff saw Dr. Silverman again. [AH 0724]. On April 23,

2013, Dr. Khan noted that Plaintiff reported feeling better than before.

In a July 1, 2013 statement submitted in support of Plaintiff's administrative appeal, Dr.

Steinberger listed Plaintiff's diagnoses to include: Crohn's disease, Debility, Right shoulder cuff

tendinosis, Right shoulder AC joint arthropathy, Myalgia and arthralgia, Arthritisdue to

inflammatory bowel disease, Chronic pain, Vertigo, Transient ischemic attach (TIA),

Gastroesophageal reflux disease (GERD), Migraine headaches, Anemia, Hypertension,

Hypothyroidism, Depression due to physical conditions, and Generalized anxiety disorder. [AH

0904]. Dr. Steinberger explained that the above-described medical conditions caused Plaintiff to

experience diarrhea and abdominal pain due to Crohn's disease, flare ups of

Crohn's disease due to stress and anxiety from physical conditions, no energy, difficulty

concentrating, pain and stiffness in all joints including hands, hips, knees and elbows, severe

fatigue, and pain in the upper back. Dr. Steinberger further stated that Plaintiff has difficulty

climbing stairs, going down stairs, exercising, getting in and out of a car, cannot kneel and is not

able to put on her socks and shoes. Dr. Steinberger explained that he previously stated, in an

October 29, 2013 letter to "Whom It May Concern," that Plaintiff was unable to work, and it was

unknown when she would be able to return to work. Dr. Steinberger further stated that when

asked to complete Defendant Sedgwick's December 17, 2012 form letter, he indicated that

Plaintiff would never be released to return to work full-duty. Dr. Steinberger concluded: "It is

my medical opinion that Debra Flynn is totally and permanently disabled from her regular

occupation as Manager, Radiation Oncology Department, and all full time employment at this time."[3]

**D.     Sedgwick's Review of Plaintiff's Claims**

Plaintiff's claim was reviewed by Margie Vargo, a "Nurse Case Manager," employed by Defendant Sedgwick. Nurse Vargo determined that Plaintiff was disabled from July 12, 2012 through December 4, 2012, but not beyond that date. Nurse Vargo found that there was "insufficient objective information to support a continued period of disability" beyond December 4, 2012. [AH 409–11]. Defendant Sedgwick initially denied Plaintiff's claim for benefits in a letter dated January 15, 2013. In the denial letter, a Sedgwick claims examiner, Lanette Morrow, reiterated Vargo's conclusions that there was "insufficient objective information to support a continued period of disability beyond 12/5/12" and that because of this, Plaintiff did not satisfy the Plan's 180-day elimination period, which would have ended January 8, 2013. [AH 0913–15]. The letter explained:

> The medical record noted your complaints of joint and muscle pain, however laboratory reports indicated that your CPK and RA factor were within normal limits. There is no documentation of an elevated sedimentation rate or c-reactive protein. Dr. Steinberger's progress note dated 12/4/12 did not provide any documentation of swollen joints or tenderness in joints. There is no documentation of restricted range of motion in joints, decreased strength or muscle spasms. The record did not note any objective testing to support your inability to lift, to carry, to push, to pull, to walk or to stand.
>
> Dr. Khan's note dated 12/4/12 indicated your depressive symptoms but also noted that they are improved. There is no documentation of poor hygiene, poor eye contact, stiffness in posture or poor articulation of speech such as stammering, mechanical or stuttering. There is no documentation of abnormal phraseology such as being slow, sluggish, halting, pressured or being rapid. You were noted to be alert and oriented x 4. Your recent and remote memory was intact and your thoughts were coherent and logical. There is no documentation of suicidal or homicidal ideation. There is no documentation that you are unable to perform

---

[3] Plaintiff submitted a Social Security Administration decision regarding her disability status dated August 21, 2014. Because this decision was not contained in the administrative record, it has no bearing on the question at bar: whether Defendants' decision to deny Plaintiff's claim for LTD benefits was arbitrary and capricious. Accordingly, the Court will disregard it.

activities of daily living. Accordingly, we reached the decision that you do not qualify for benefits under the terms of the Ascension Health Long-Term Disability Plan.

[AH 0914].

Plaintiff appealed the benefit denial in a letter dated July 1, 2013. Plaintiff submitted a copy of the relevant Plan documents, prior correspondence, updated medical records, medical literature about Plaintiff's disabling conditions, and Dr. Steinberger's sworn statement attesting to Plaintiff's total disability and inability to work. Plaintiff's attachments contained information ranging from medical records to Wikipedia entries regarding medical conditions.

Defendant Sedgwick referred Plaintiff's claims file to Reliable Review Services, which remitted Plaintiff's medical records to three independent reviewers. Dr. Alan Altman, Board Certified in Gastroenterology and Internal Medicine, completed an independent review from a gastroenterology perspective. [AH 1698–1711]. Dr. Altman was paid $475 for his review, and $237.50 for an addendum he later submitted after reviewing additional records. Dr. Gary Nudell, Board Certified in Internal Medicine, completed an independent review from an internal medicine perspective. [AH 1721–28]. Dr. Nudell was paid $525 for his review. Dr. Warren Tuff, Board Certified in Psychiatry, completed an independent medical review from a psychiatric perspective. [AH 1730–36]. None of the three independent reviewers contacted or examined Plaintiff. Instead, their respective reviews were limited to medical records, the claims file, and, in some instances, speaking with Plaintiff's treating physicians. Dr. Nudell spoke with Dr. Lebeis. He could not reach Dr. Silverman, or set a time to speak with Dr. Steinberger, who advised Dr. Nudell to rely on Dr. Steinberger's records. Dr. Nudell concluded that Plaintiff was not disabled as of December 5, 2012, finding:

> None of claimant's internal medicine conditions, including but not limited to hypertension, migraine headaches, patent foramen ovale (PFO), preventricular contractions (PVCs), or hypothyroidism would otherwise restrict work function.
> …

The claimant reported joint pain, thought to be secondary to Crohn's disease. Physical examinations however, did not document any significant synovitis or significant musculoskeletal abnormalities that would otherwise restrict work function following December 05, 2012.
…
The claimant was hospitalized for a possible TIA, though overall imaging was normal, and again there were no lingering neurologic deficits that would otherwise restrict work function. The claimant has a history of hypothyroidism, without documentation of any work restriction based on this chronic condition.

Ultimately, I would opine that form an internal medicine perspective only, the claimant's chronic medical conditions would not restrict the claimant from returning to her prior occupation as of December 05, 2012.

[AH 1723–25].

Dr. Altman attempted to contact Dr. Zimmermann and Dr. Steinberger, but was unable to reach them. He issued his report without speaking with them. [AH 1707]. Dr. Altman concluded that Plaintiff was not Disabled as of December 5, 2012, stating:

The documentation establishes a hospitalization in July of 2012, with symptoms of abdominal pain and diarrhea, but without evidence of active mucosal Crohn's disease…The claimant had a partial response to prednisone, which was tapered over time.
…
Her gastroenterologist felt she could return to work when her prednisone dosage was tapered to less than 20 mg/day and this occurred well before December of 2012. There is no documentation to support the presence of an active inflammatory arthropathy associated with irritable bowel disease as multiple examinations of her extremities reported only edema. From a gastrointestinal disease perspective and consistent with the recommendation of Dr. Zimmermann the claimant had the functional capacity to return to work as of December 05, 2012 going forward.

[AH 1706–08].

After having received additional medical records from Dr. Zimmerman, Dr. Altman supplemented his review with an addendum on August 20, 2013. [AH 1803–05]. Upon review of those records, Dr. Altman concurred with Dr. Zimmerman's March 4, 2013 conclusion that Plaintiff "would not qualify for medical disability based on the severity of her Crohn's disease." [AH 1805].

In connection with Dr. Tuff's review of Plaintiff's psychiatric condition, Dr. Tuff spoke with Dr. Kahn and Dr. Greenshields by telephone. According to Dr. Tuff, Dr. Kahn opined that Plaintiff "d[id] not have any mental health issues that would disable her as he [was] of the opinion that it [was] her medical problems that [were] paramount." [AH 1732]. Dr. Tuff unsuccessfully attempted to reach Dr. Steinberger. Based on his conversations with Plaintiff's treatment providers and upon a review of Plaintiff's records, Dr. Tuff concluded:

> The claimant has multiple chronic physical illnesses, which combined with her characteristic tendency to over-react to things, produced symptoms of anxiety and depression. There is no objective evidence of how her mental health symptoms would directly adversely impact her work performance.

[AH 1733].

On September 3, Sedgwick upheld the benefit denial in a letter to Plaintiff from appeals specialist Kim Pirok. [AH 1818–21].

## Legal Standards

### A.     Summary Judgment Standard

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other

evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson* 477 U.S. at 256; *Littrell*, 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson*, 477 U.S. at 248; *Woods*, 409 F.3d at 990.

To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995) (quoting *Putman v. Unity Health System*, 348 F.3d 732, 733–34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. 242 at 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202; *Davidson & Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

Summary Judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to

judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.*, 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526–27(8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines*, 536 F.3d 813, 818 (8th Cir. 2008).

**B.      ERISA Standard**

Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits . . . ." 29 U.S.C. § 1132(a)(1)(B). A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

If an ERISA plan grants the administrator discretion to construe the plan and to determine benefits eligibility, as in this case, the Court must apply a deferential abuse-of-discretion standard in reviewing the plan administrator's decision. *Jessup v. Alcoa, Inc.*, 481 F.3d 1004, 1006 (8th Cir. 2007). Under the abuse of discretion standard applicable in this case, the Court will "reverse the plan administrator's decision 'only if it is arbitrary and capricious.'" *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006) (quoting *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)). "To determine whether a plan administrator's decision was arbitrary and capricious, 'we ask whether the decision to deny . . . benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance.'" *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000) (quoting

*Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997)). "Provided the decision 'is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made.'" *Id.* (quoting *Cash*, 107 F.3d at 641. "The requirement that the [plan administrator's] decision be reasonable should be read to mean that a decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Midgett v. Washington Group Intern. Long Term Disability Plan*, 561 F.3d 887, 896–97 (8th Cir. 2009) (internal citation and quotation marks omitted).

### Discussion

The questions before the Court are whether genuine issues of material fact exist, based on the administrative record, as to the reasonableness of Defendants' decision to deny Plaintiff's claim for long term disability benefits and, if not, whether one party is entitled to judgment as a matter of law. The parties' competing Motions for Summary Judgment each argue that there is no genuine issue of material fact with respect to this decision, but differ in their conclusion— with Plaintiff asserting that she is entitled to judgment as a matter of law because the denial was clearly arbitrary and capricious, and Defendants arguing that they are entitled to judgment as a matter of law because the denial was clearly reasonable and supported by substantial evidence such that it was not an abuse of discretion.

For the reasons that follow, the Court finds that genuine issues of material fact do exist and, accordingly, will deny the parties' competing Motions. Further, the Court will remand this case to Defendant Sedgwick with directions to reopen the administrative record.

### A.    Conflict of Interest

Plaintiff argues that, despite hiring Defendant Sedgwick to administer the claims brought under the Plan, Defendant Ascension retained discretionary authority to determine eligibility for

benefits and therefore acted under a conflict of interest in terminating Plaintiff's benefits. [Doc. No. 62 at 4–5] [citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)]. However, the record clearly establishes that, under the Plan, benefits are paid by Defendant Ascension and claims determinations are made by Defendant Sedgwick**.** Therefore, as this Court has previously determined with regard to Ascension's self-funded LTD Plan administered by Sedgwick, "there can . . . be no inherent conflict of interest as the payor of benefits does not make the determination of disability." *Vega v. Ascension Health*, 997 F. Supp. 2d 1000, 1009 (E.D. Mo. 2014).

**B.     Medical Opinions**

**1.     Internal Medicine**

Plaintiff's internist, Dr. Steinberger, opined that Plaintiff was disabled and could not return to work beyond December 5, 2012, or the elimination date of January 8, 2013. [AH 0375, 0897, 0904–05].[4] Dr. Nudell—the internist who conducted an independent medical review of Plaintiff's file—considered Dr. Steinberger's notes, medical records, and opinions, and expressed a different opinion: "Ultimately I would opine that from an internal medicine perspective only, the claimant's chronic medical conditions would not restrict the claimant from returning to her prior occupation as of medical conditions would not restrict the claimant from returning to her prior occupation as of December 5, 2012." [AH 1725]. The Court cannot find that it was unreasonable for Defendants to credit the opinion of Dr. Nudell over Dr. Steinberger. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Weidner v. Fed. Express*

---

[4] Plaintiff's psychologist, Dr. Greenshields, opined similarly that "[t]his [patient] is unable to work and there is no evidence as to when/if she can work." [AH 1612]. However, Dr. Greenshields, as a psychologist, and not a licensed physician, cannot certify Plaintiff as disabled under the plan. [See AH 0012–13] ["A licensed *psychiatrist* must supervise all treatment of Disabilities related to Mental Illness. . . . *psychologists* cannot certify disability under the Plan."] [emphasis added]. Accordingly, the Court will not consider the opinions of Dr. Greenshields.

*Corp.*, 492 F.3d 925, 930 (8th Cir. 2007). Despite Plaintiff's arguments to the contrary, the fact that Dr. Nudell did not examine Plaintiff does not alter this conclusion. *See Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 899–200 (8th Cir. 2006).

### 2.    Gastroenterology

Plaintiff was discharged from the hospital on July 18, 2012 with instructions to take 60 milligrams of prednisone daily, and to taper the amount week by week. When Plaintiff saw Dr. Zimmerman, her gastroenterologist, on July 26, 2012, she was down to 50 milligrams of prednisone per day. Dr. Zimmerman instructed Plaintiff to taper her prednisone use by10 milligrams per day every week until she was down to 40 milligrams per day, and then taper by 5 milligrams per day every week until she was down to 20 milligrams per day, and then taper by 5 milligrams per day every week until she was off of prednisone. [AH 0243–44]. Dr. Zimmerman instructed Plaintiff not to return to work until she was below 20 milligrams per day. [AH 0244].

Based on this schedule, Plaintiff would have been down to 15 milligrams per day by the week of September 6, 2012 and thus ready to return to work pursuant to Dr. Zimmerman's instructions. However, when Dr. Zimmerman saw Plaintiff on September 17, 2012, she noted that Plaintiff was currently taking 20 milligrams a day. [AH 0314]. Dr. Zimmerman again instructed Plaintiff to taper by 5 milligrams per week, and not to work until she was below 20 milligrams. [*Id.*]. Based on Dr. Zimmerman's September 17, 2012 note, Defendants extrapolate that "Plaintiff's gastroenterologist released her to work on or around September 24, 2012 (once her prednisone dosage was below 20 milligrams per day)[.]" [Doc. No. 65 at 7] [citing AH 1779].

However, despite Dr. Zimmerman setting the taper schedule at the July 26, 2012 visit, and reinforcing it at the September 17, 2012 visit, the record far from reflects that Dr. Zimmerman "released [Plaintiff] to work on or around September 24, 2012." Rather, the record

contains a form Dr. Zimmerman completed for Sedgwick on December 2, 2012 explaining that Plaintiff's Crohn's disease was "objective medical evidence" supporting her disability, and that she would be able to return to work when her prednisone dose decreased to less than 20 milligrams. [AH 1618]. The existence of this form in the record, when viewed in a vacuum, would clearly demonstrate that Dr. Zimmerman had not cleared Plaintiff to return to work as of December 2, 2012 or, likely, December 4, 2012.

The Court, of course, does not consider Dr. Zimmerman's December 2, 2012 form in a vacuum, but rather in the context of the record. Defendants correctly note that, prior to December 2, 2012, Plaintiff's last visit with Dr. Zimmerman reflected in the record was on September 17, 2012. From this, Defendants conclude that on the December 2, 2012 form, Dr. Zimmerman "noted the most recent (but outdated) restriction on Plaintiff's activities, from September 17, 2012: 'patient can return to work when prednisone dose is <20 mg.'" [Doc. No. 69 at 4]. Defendants argue that the record demonstrates that Plaintiff was off of prednisone well before December 2, 2012. In support of this contention, Defendants note that "Prednisone is not listed among current medications in reports from Plaintiff's November 6, 2012 or December 4, 2012 office visits with Dr. Steinberger." [Doc. No. 69 at 4] [citing AH 1531, 1667].

The Court finds Defendants' conclusion regarding when Plaintiff went off prednisone to be pure speculation. Although Defendants are correct that Dr. Steinberger's notes from Plaintiff's November 6 and December 4, 2012 office visits did not list prednisone as a current medication, Dr. Steinberger's notes from Plaintiff's August 20, September 14, October 10, and October 19, 2012 office visits similarly do not list prednisone as a current medication. Based on Dr. Zimmerman's September 17, 2014 notes, Plaintiff would have still been on the initial taper schedule on August 20 and September 14, 2012. This fact obviates the import of the absence of reported prednisone usage in Dr. Steinberger's November 6 and December 4, 2012 notes.

Further, records from many of Plaintiff's other visits reflect continuing use of prednisone: September 24, 2012 (Dr. Lebeis) [AH 0692]; September 28, 2012 (Dr. Silverman) [AH 0236]; October 11, 2012 (Dr. Silverman) [AH 0235]; November 5, 2012 (Dr. Lebeis) [AH 0696]; and November 9, 2012 (Silverman) [AH 0719]. When viewed in this context it appears equally plausible, if not more plausible, that Dr. Zimmerman's December 2, 2012 form was meant to be read just as it was written: Plaintiff's Crohn's disease was "objective medical evidence" supporting her disability, Plaintiff was still on at least 20 milligrams prednisone as of December 2, 2012, and Plaintiff was not to return to work until her prednisone dose decreased to less than 20 milligrams. [AH 1618]. At the very least, disputed issues of material fact exist as to the import of Dr. Zimmerman's December 2, 2012 form.[5] *See Hitt*, 356 F.3d at 923.

Defendants credit the report of Dr. Altman—the gastroenterologist who conducted an independent medical review of Plaintiff's file—which concluded that Plaintiff was not disabled from a gastroenterology perspective. However, Dr. Altman's conclusions rested heavily upon his understanding of Plaintiff's medical record as demonstrating that Plaintiff was taking less than 20 milligrams per day of prednisone "well before December of 2012," and Dr. Altman's possibly mistaken belief that Dr. Zimmerman had concluded that Plaintiff could work as of December 5, 2012. Dr. Altman wrote:

> Prednisone was to be decreased by 5 mg/week until off completely. At the time [(September 17, 2012)] she was taking 20 mg/day.
>
> Dr. Zimmerman felt the claimant could return to work when she is below 20 mg of prednisone/day. . . .

---

[5] Defendants further contend that if Plaintiff was still on prednisone by December of 2012, more than 11 weeks after her September visit with Dr. Zimmerman, it could only mean that she did not follow Dr. Zimmerman's tapering instructions, which is required by the Plan. [Doc. No. 69 at 3 n.1] ["Pursuant to Section 4.5(e) of the LTD Plan, monthly Disability benefits terminate on '[t]he date the Participant . . . is not following the course of treatment recommended by the Licensed Physician.'"] [citing AH 0029]. However, this requirement is irrelevant here, because if Dr. Zimmerman's December 2, 2012 form is read to mean that Plaintiff was still on prednisone as of that date, it is reasonable to infer that Dr. Zimmerman so instructed her.

> Therefore, as of December 5, 2012 going forward she was on less than 20 mg/prednisone . . . . *Consistent with the recommendation of Dr. Zimmerman* she had the capacity from a gastrointestinal disease perspective to perform her usual occupational tasks.
>
> Her gastroenterologist felt she could return to work when her prednisone dosage was tapered to less than 20 mg/day and this occurred well before December of 2012. . . . From a gastrointestinal disease perspective *and consistent with the recommendation of Dr. Zimmerman* the claimant had the functional capacity to return to work as of December 05, 2012 going forward.

[AH 1706–08] [emphasis added]. Although Dr. Altman did attempt to telephone Dr. Zimmerman three times between July 31 and August 2, 2013, he was unsuccessful and, accordingly, could not verify his belief that Dr. Zimmerman no longer had Plaintiff on prednisone as of December 5, 2012. [AH 1707].

Given the disputed issues of material fact concerning Plaintiff's prednisone usage on December 5, 2012, the Court cannot at this time adjudicate whether Defendants' decision to deny Plaintiff's claim for long term disability benefits was arbitrary and capricious. *See Samuels*, 437 F.3d at 801 ("Summary Judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."). The Court will therefore deny both Motions for Summary Judgment.

A reviewing court must remand a case when the court or agency fails to make adequate findings or explain the rationale for its decision. *Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir. 1990). This course of action is appropriate in ERISA cases. *Abram v. Cargill, Inc.*, 395 F.3d 882, 887–88 (8th Cir. 2005) superseded by regulation on other grounds in *Midgett v. Wash. Group Int'l Long Term Disability Plan*, 561 F.3d 887 (8th Cir. 2009); *see also Harden v. Am. Express Fin. Corp.*, 384 F.3d 498, 500 (8th Cir.2004) (per curiam) (remanding to the plan administrator where the plan failed to obtain and consider social security records, which the plan implied it

would consider); *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 773–76 (10th Cir. 2004) (remanding where the plan failed to obtain or consider information about the claimant's termination for use of narcotic painkillers); *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (noting that remand is appropriate when an ERISA plan does not make adequate findings or adequately explain its reasoning)).

Accordingly, the Court will remand this case to Sedgwick with directions to reopen the administrative record to either determine the status of Plaintiff's prednisone use as of December 5, 2012, and Dr. Zimmerman's opinions thereon, or to request a revised report from Dr. Altman which does not rely on his previous assumption that Plaintiff was off of prednisone per Dr. Zimmerman's instructions as of December 5, 2012.

### Conclusion

Based on the foregoing, the Court will deny the parties Motions for Summary Judgment. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 58] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. No. 61] is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to Defendant Sedgwick to reopen the administrative record for the limited purpose discussed herein.

Dated this 20th day of July, 2015.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE